IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA


Marcia Gorham-Coleman,               )        C/A No.: 1:09-659-MBS-SVH
                                     )
           Plaintiff,                )
                                     )
vs.                                  )
                                     )        REPORT AND RECOMMENDATION
Michael Astrue, Commissioner of      )
Social Security                      )
                                     )
           Defendant.                )
                                     )
_____    )


         This is an action brought pursuant to Sections 205(g) and 1631(c)(3) of the Social

Security Act, as amended, 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of

a "final decision" of the Commissioner of Social Security, denying Plaintiff's claim for

Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI). The only

issues before the Court are whether the findings of fact are supported by substantial

evidence and whether proper legal standards have been applied. This case was referred to

the undersigned for a report and recommendation pursuant to Local Rule 73.02(B)(2)(a),

(D.S.C.).

         On August 12, 2004, Plaintiff filed applications for DIB and SSI with an alleged

onset date of November 30, 2003.  Tr. 67–68, 335.  After her claims were denied initially

and upon reconsideration, Plaintiff requested a hearing before an administrative law judge

(ALJ), which was held on September 25, 2007. Tr. 35–49, 229–35, 246–93.  On January

23, 2008, the ALJ denied Plaintiff's claims, finding she could perform her past work as a

medical lab technician or a security guard. Tr.14–30. When the Appeals Council denied Plaintiff's request for review, the ALJ's decision became the Commissioner's final decision for purposes of judicial review. Tr. 6–8. *See* 20 C.F.R. § 404.981.2. On March 16, 2009, Plaintiff filed a complaint in this court, alleging that the Commissioner's decision is contrary to law and not supported by substantial evidence.

I.      Plaintiff's Background and Medical History

Plaintiff was born in 1955 and was 52 years old at the time of the ALJ's decision. Tr. 62. She has an Associate of Science degree in medical laboratory technology and past relevant work ("PRW") experience as a refrigeration tester, lab technician, press operator, medical lab technician, and security guard. Tr. 253, 285.

A.      Medical Evidence

1.      Medical Evidence Before Plaintiff's Alleged Onset Date of November 30, 2003

Christopher D. Rucker, M.D., examined Plaintiff in November 2002 regarding ear problems. Tr. 110-11. Plaintiff wore a left-sided hearing aid and told Dr. Rucker that she had had decreased hearing in both ears for twenty years, and that the hearing in her left ear was worse than that in her right ear. Tr. 110. Dr. Rucker found Plaintiff had decreased auditory acuity with speech discrimination of 56% in the right ear and 52% in the left ear. Tr. 110, 113. He found her tympanic membranes were intact and noted she had resolved external otitis with sensorineural hearing loss. Tr. 110–11. In a report to the South Carolina Vocational Rehabilitation Department, Audiologist Rebecca Benedict stated that Plaintiff should obtain a digitally programmable hearing aid and should be restricted to

occupations in which hearing was not "a crucial necessity." Tr. 115. In April 2003, Plaintiff complained of decreased hearing after an ear infection. Tr. 112. Her hearing loss was assessed as moderate-to-severe in the right ear and moderate-severe-to-severe in the left ear. Tr. 112.

Plaintiff began treatment at Palmetto Hematology Oncology on October 27, 2003. Tr. 141. She related that she had been diagnosed with polycythemia in 1997 and that her symptoms consisted of diarrhea, lack of appetite, nervousness, night sweats and varicose veins. Tr. 145. She also reported a history of decreased hearing since her early twenties, an occasional cough, and that her legs had swollen the previous summer, but that the swelling had resolved itself. Tr. 141. She said that she had smoked one pack of cigarettes per day for 15 years. Tr. 142. She denied incontinence, visual changes, headaches, neurological symptoms or pruritis, and she stated that her main problem was diarrhea, which usually occurred in the mornings and had been present for several years. Tr. 141. Colin P. Curren M.D., noted that Plaintiff's examination was unremarkable, that she was "obviously hard of hearing," and that she had not had regular medical care since September 2002. Tr. 141–42. He diagnosed Plaintiff with probable polycythemia vera and diarrhea and prescribed Hydrea. Tr. 142.

On November 24, 2003, Dr. Curren noted Plaintiff had undergone a phlebotomy the week before and that she had tolerated it well except for slight lightheadedness and chest discomfort. Tr. 136. Plaintiff reported slightly more energy after the procedure and had "no new complaints of any other sort." Tr. 136. Because her arterial blood gas results

raised a question of intrinsic lung disease, Dr. Curren ordered pulmonary function tests, which showed minimal obstructive airways disease.  Tr. 117–19, 136.

> 2.    Medical Evidence After Plaintiff's Alleged Onset Date of November 30, 2003

On December 8, 2003, Plaintiff reported "nice improvement" and almost-complete resolution of her diarrhea to Dr. Curran after a second phlebotomy. Tr. 137.  She denied any other symptoms.  Tr. 137.  Dr. Curran noted that Plaintiff's pulmonary tests had shown mild-to-moderate obstructive airway disease and urged her  "in the strongest possible terms" to stop smoking.  Tr. 137.

Plaintiff returned to Dr. Curran in March 2004, after "she was lost to follow up for several weeks." Tr. 135.  She reported no new symptoms, was exercising a fair amount, but was still smoking, although she told Dr. Curran she had reduced the number of cigarettes she smoked to one pack every two-to-three days.  Tr. 135.  Plaintiff was "asymptomatic" and "doing well" when she saw Dr. Curran in April 2004.  Tr. 134.

On May 24, 2004, Plaintiff complained to Dr. Curran of upper respiratory congestion and a cough, but she "otherwise [felt] decent."  Tr. 132.  A chest x-ray showed underlying fibrogranulomatous scarring and chronic obstructive pulmonary disease (COPD), but no acute intrathoracic pathology.  Tr. 133.   Dr. Curren prescribed an Albuterol inhaler and performed a phlebotomy.  Tr. 132.

Dr. Curren performed another phlebotomy on Plaintiff on June 28, 2004.  Tr. 131.  Plaintiff had no new complaints, and she reported that her cough had resolved, that she felt much better, and that she had reduced her smoking to six cigarettes per day.  Tr. 131.

On August 2004, Plaintiff told Dr. Curran that she had recently lost her job and was having "a fair amount of personal problems," which she related to childhood memories of her father's suicide. Tr. 130. She also told Dr. Curran that she was applying for disability based on hearing loss and asked if her hearing loss was related to polycythemia. Tr. 129. Dr. Curran told her it was not. Tr. 129.

In September 2004, Dr. Curran noted that Plaintiff had responded well to a phlebotomy in August and that she had insisted her hearing loss was caused by her polycythemia. Tr. 128. Dr. Curran told her that "in general, this is not felt to be the case, especially in someone who is relatively well controlled." Tr. 128.

In October 2004, Plaintiff underwent an audiological and hearing aid evaluation, which showed "a moderate-severe-to-severe hearing loss," especially in the left ear. Tr. 171. Her speech discrimination with hearing aids was 70% at 55 dB. Tr. 171. Audiologist Richard L. Compton stated that Plaintiff's hearing levels were stable and that, even with hearing aid amplification, she had significant difficulty hearing, understanding conversational speech and accessing auditory information. Tr. 171.

William Hopkins, M.D., assessed Plaintiff's physical residual functional capacity ("RFC") at the request of the Commissioner in December 2004. Tr. 163–70. Dr. Hopkins found Plaintiff had no exertional limitations, but would have difficulty with speech discrimination, especially in loud ambient environments. Tr. 164–67. He concluded that she should avoid exposure to loud ambient environments and concentrated exposure to

hazards and fumes, odors, gases, etc. Tr. 167. Hugh A. Clarke, M.D., affirmed Dr. Hopkins' assessment in March 2005. Tr. 170.

James N. Ruffing, Psy. D., evaluated Plaintiff on January 25, 2005. Tr. 173–76. Plaintiff told Dr. Ruffing she had not sought psychiatric treatment before, nor had she used psychotropic medications. She complained of problems related to her memory of her father's suicide, which occurred when she was five years old. Tr. 173–75. She stated that she had her "ups and down" and that when she was "down" she felt depressed and nervous and lacked interest in life. Tr. 174. She said she did not trust anyone, but that she lived with a man with whom she was romantically involved. Tr. 173–74. She told Dr. Ruffing that she had been laid off from her job in November 2003, but could not say why. Tr. 174. She stated that her daily activities included cleaning, cooking, doing, laundry, caring for her dog, shopping, and hobbies such as stripping furniture. Tr. 174. She reported smoking two-to-three packs of cigarettes per day and said she had used marijuana a few months before. Tr. 174.

Dr. Ruffing found Plaintiff was hard of hearing and needed him to repeat many questions and statements. Tr. 174. He found her "somewhat cynical if not sarcastic in her interpersonal style," at times demonstrating inappropriate affect. Tr. 174. Dr. Ruffing found Plaintiff had intact thought processes, intact memory function, adequate cognitive faculties, and no signs of psychosis. Tr. 175. He provisionally diagnosed cyclothymic disorder, but "could not get an indication for clear manic episodes affecting her social/occupational and interpersonal life." Tr. 175. He noted indications of major

depression or chronic dysthymia and "borderline or histrionic-type functioning." Tr. 175. Dr. Ruffing also stated that Plaintiff "would have some limitations in maintaining socially appropriate and predictable behavior," but that she could "likely perform repetitive tasks and can understand, remember, and carry out detailed instructions." Tr. 175.

Lisa Varner, Ph.D., completed a Psychiatric Review Technique form concerning Plaintiff at the Commissioner's request in February 2005. Tr. 177–90. Dr. Varner reported that Plaintiff had an affective disorder that caused mild limitations in activities of daily living, moderate limitations in maintaining social functioning and concentration, and no extended episodes of decompensation. Tr. 187. She reported that Plaintiff did not meet the criteria of the listing for affective disorders and that she could perform simple, repetitive work in a setting that did not require ongoing interaction with the public. Tr. 188–89. In a mental RFC Assessment, Dr. Varner reported that Plaintiff had no significant limitations in most areas of functioning and moderate limitations in the following areas: understanding and remembering detailed instructions, carrying out detailed instructions, and interacting appropriately with the general public. Tr. 191–92.

Audiologist Lynn M. Lehman performed an audiological evaluation of Plaintiff on January 23, 2006, at the request of Plaintiff's attorney. Tr. 199–200. Plaintiff told the audiologist that she had had a hearing loss since her early twenties and had worn hearing aids for many years. Tr. 199. She denied a history of recent middle ear pathology, otologic surgery, tinnitis, or dizziness. Tr. 199. Dr. Lehman found Plaintiff had a moderately-severe-to-severe sensorineural hearing loss, worse in the left ear than in the

right, with speech discrimination of 80% in the right ear and 45% in the left ear.  Tr. 199.

She recommended that Plaintiff continue to use amplification (hearing aids).  Tr. 199.

C. David Tollison, Ph.D., evaluated Plaintiff in February 2006 at the request of Plaintiff's attorney.  Tr. 202–05.  Plaintiff reported problems with hearing loss for many years, use of bilateral hearing aides, and progressive loss of hearing over time.  Tr. 202. She also reported a long history of smoking and shortness of breath on exertion.  Tr. 202. She said that she was not currently receiving medical care or taking prescription medications for financial reasons and because she was not motivated.  Tr. 202.  She said she had not received psychiatric treatment before, that she had struggled with depression all her life, was suspicious of others, and had difficulty forming relationships.  Tr. 202–03. She said she occasionally used marijuana once or twice per month.  Tr. 203.

Dr. Tollison described Plaintiff as "an angry individual who suffers generalized feelings of apprehension, uncertainty, and insecurity."  Tr. 203.  He found she had poor insight and social skills and lacked optimism about the future.  Tr. 203.  He found she had average or above-average intelligence, coherent but "unusual" thought processes, intact memory, intact expressive and receptive language, mildly blunted affect, and mildly dysphoric mood.  Tr. 203–04.  Her MMPI test results suggested moderate affective distress and moderate anxiety-related symptoms.  Tr. 204.  She exhibited no symptoms of psychosis.  Tr. 203.

Dr. Tollison diagnosed Plaintiff with affective disorder (cyclothymic disorder), personality disorder (borderline and histrionic features with possible paranoid and schizoid

features), and a GAF code of 453. Tr. 205. He stated that she lacked the concentration, persistence, or pace typically required in a work setting, exhibited a marked lack of social skills, could not interact effectively with colleagues, supervisors, and the general public, and could not complete a series of workdays without interruption from psychological symptoms. Tr. 205. He stated that she lacked the ability to accept instructions and respond appropriately to criticism, that work pressures would cause further deteriorating in her functioning, and that her condition was chronic. Tr. 205.

On February 16, 2007, Plaintiff saw Kim Hont A. Yee, M.D., for treatment of polycythemia. Tr. 217. She told Dr. Yee that she stopped seeing Dr. Curran in 2004 because of insurance problems. She also reported to Dr. Yee that she had just begun feeling more fatigued and nervous. Tr. 217. Dr. Yee's notes indicate Plaintiff "has a history of manic-depressive disorder[,]" and Dr. Yee noted that Plaintiff was "very manic" at the time of that examination. Tr. 217. Plaintiff's physical examination showed no abnormalities, and Dr. Yee found no need for a phlebotomy. She recommended psychiatric treatment for manic depression. Tr. 217–18.

When he saw Plaintiff in March 2007, Dr. Yee noted Plaintiff was "behaving much better" and was "not on a manic phase." Tr. 216. He noted that Plaintiff appeared slightly flushed and plethoric and diagnosed her with polycythemia ruba vera exacerbated by chronic cigarette abuse. Tr. 216. Dr. Yee ordered a phlebotomy and strongly advised Plaintiff to stop smoking. Tr. 216. In April 2007, Dr. Yee noted Plaintiff was no longer plethoric and had good energy and appetite. Dr. Yee ordered a "maintenance therapeutic

phlebotomy." Tr. 215. In July 2007, Dr. Yee noted that Plaintiff was still smoking heavily and appeared flushed and plethoric. He again ordered a phlebotomy.

Dr. Tollison evaluated Plaintiff again in September 2007. Tr. 225–28. He noted that Plaintiff was taking Paxil for her psychological symptoms and that Dr. Yee had diagnosed her with manic depression. Tr. 225. He found Plaintiff exhibited "oddities of thought, perception and behavior;" was difficult to communicate with because of her hearing problem; alternated between smiling and crying throughout the evaluation; exhibited schizoid tendencies and paranoid thinking; and was defeatist in attitude and impulsive in behavior. Tr. 226. He reported that her MMPI results showed a "moderate increase in reactivity and demonstrated a lack of coping skills and adaptive behaviors" and increased anxiety. Tr. 226. Dr. Tollison concluded that Plaintiff could not work a series of days without interruption from psychological symptoms, would have difficulty working with others, would deteriorate under work pressure, could not remember and carry out instructions, and would behave disruptively in the workplace. Tr. 227. He again diagnosed affective disorder, personality disorder, and a GAF of 45. Tr. 227.

B.    Testimony

At the hearing on September 25, 2007, Plaintiff testified that she moved to South Carolina in September 2002, met her husband in October 2002, began living with him in 2003, and married in August 2006. Tr. 275. She testified that she was unable to work because of poor hearing. Tr. 265–66. She testified that she stopped working in November 2003 because she was laid off and that she collected unemployment for six-to-twelve

months.  Tr. 254–55.   She testified that she looked for work when her unemployment benefits stopped but no one would hire her.  Tr. 255–56.   She testified that after she applied for disability benefits, people advised her not to go to work because her application would automatically be denied.  Tr. 257.  She said that she tried marijuana twice when she was 17 years old, but had not used it since.  Tr. 264.  She testified that she had great difficulty with telephone conversations.  Tr. 266–67.  She testified that the symptoms of her polycythemia were tiredness, fatigue, diarrhea, and nervousness, and that she underwent phlebotomies for polycythemia every two months.  Tr. 268–69.  She testified that she could not run very far with her dog because of shortness of breath.  Tr. 269–70.  She testified that during the day she felt depressed and just "[hung] around," read a little, and washed dishes and clothes.  Tr. 273–74. She said she stripped furniture as a hobby until 2005, when she stopped because of a lack of motivation.  Tr. 275–76.  She said that she cried in the mornings and thought counseling would be helpful to her, but she could not afford it.  Tr. 278.

Vocational Expert ("VE") G. Mark Leaptrot attended the hearing and testified.  He classified Plaintiff's past jobs of refrigeration tester, lab technician, and medical lab technician as light, skilled work, and her jobs of press operator and security guard as light, semi-skilled work.  Tr. 284–85. The ALJ asked Mr. Leaptrot to assume that Plaintiff had moderately-severe-to-severe sensory neural hearing loss with speech discrimination of 80% in the right ear and 45% in the left ear and that she needed a job that involved little to no conversation and no exposure to very dirty air and dangerous environments.  Tr.

285–86.  He responded that such a person could work as a security guard or medical lab technician.  Tr. 287.  The ALJ found Plaintiff was not disabled.

II.    Discussion

Plaintiff argues that the Commissioner's findings are in error because the ALJ failed to do the following:

1.    Properly determine whether the claimant's past work lasted long enough to become proficient and compare the claimant's limitations with the details of the job;

2.    Properly evaluate the claimant's physical and mental RFC; and

3.    Conduct an appropriate evaluation of the claimant's credibility.

The Commissioner counters that the ALJ's decision should be affirmed because it is supported by substantial evidence and contains no legal error.

A.    ALJ Findings

In her January 23, 2008 decision, the ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

2.    The claimant has not engaged in substantial gainful activity since November 30, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 et seq., 416.920(b) and 416.971 et seq.).

3.    The claimant has the following severe impairments: polycythemia rubra vera, hearing loss, chronic obstructive pulmonary disease, cyclothymia and personality disorder. (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at exertional levels but with the following nonexertional limitations: a limitation to little or no personal interaction or conversation with others required on the job; the need to avoid very dusty air; the need to avoid dangerous situations; and the need to avoid excessive noise.

6. The claimant is capable of performing past relevant work as a medical lab tech or a security guard. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 2003 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. 16–30.

B. Legal Framework

1. The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines "disability" as follows:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of "disability" to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1; (4) whether such impairment prevents claimant from performing PRW; and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant "disabled or not disabled at a step," Commissioner makes determination and "do[es] not go on to the next step.").

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Id.* If the Commissioner satisfies its burden, the claimant must then establish that she is unable to perform other work. *Id.; see generally Bowen v. Yuckert*, 482 U.S. 137, 146. n.5 (1987) (regarding burdens of proof).

### 2.    The Court's Standard of Review

The Social Security Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See id., Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002) (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 428 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345

(4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Perales*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings, and that his conclusion is rational. *See Vitek v. Finch*, 428 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

C.     Analysis

The ALJ found that Plaintiff is not disabled because she is "capable of performing PRW as a medical lab tech or a security guard[,]" and that such work "does not require the performance of work-related activities precluded by [Plaintiff's] residual functional capacity . . . ." Tr. 29. The ALJ found that Plaintiff has the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: a limitation to little or no personal interaction or conversation with others required on the job; the need to avoid very dusty air; the need to avoid dangerous situations; and the need to avoid excessive noise." Tr. 23. "[U]nder the fourth step of the disability inquiry, a claimant will be found 'not disabled' if [s]he is capable of performing [her] past relevant

work either as [s]he performed it in the past or as it is generally required by employers in the national economy." *Pass v. Chater*, 65 F.3d 1200, 1207 (4th Cir. 1995).

Plaintiff challenges the finding that she can return to PRW and the restrictions the ALJ placed on her functional capacity. She also challenges the ALJ's findings as to her credibility in discounting some of her claimed symptoms. The Commissioner disagrees, arguing that the ALJ's decision is supported by substantial evidence and does not contain reversible legal error.

D.    The ALJ's Decision that Plaintiff Could Perform PRW is Supported by Substantial Evidence.

Plaintiff challenges the ALJ's finding that she can perform PRW as a medical lab specialist or security guard on the following grounds: 1) she did not work as a medical lab technician long enough for it to qualify as PRW; 2) the demands of the two of her past jobs that the ALJ found she could still perform—medical lab technician and security guard—exceed her RFC that the ALJ imposed; and 3) the ALJ did not resolve a conflict between the VE's testimony and the description in the Dictionary of Occupational Titles ("DOT") regarding the job's requirements. *See Pl.'s Br.* 13–16. The Commissioner disagrees, arguing that the ALJ's decision is supported by substantial evidence and that Plaintiff has not sustained her burden of showing she is unable to perform her PRW. Def.'s Br. 15–19.

1.    Plaintiff's PRW Included Work as a Medical Lab Technician.

Plaintiff argues that because she worked at her past job as a medical lab technician for only three months, that job did not qualify as PRW for purposes of determining her

application for disability benefits. Pl.'s Br. 13–14. The Commissioner claims, however, that Plaintiff's experience as a medical lab technician is relevant and appropriately considered based on her education and work experience combined.

PRW is substantial gainful activity that a claimant has done within the past fifteen years that lasted long enough for the claimant to learn to do it. 20 C.F.R. §§ 404.1565(a) and 416.965(a). SSR 82-62 explains that the past experience must have "current relevance concerning duration and recency." SSR 82-62. Duration depends on the nature and complexity of the work and must be "sufficient for the worker to have learned the techniques, acquired information, and developed the facility needed for average performance in the job situation." *Id*. A claimant is not disabled within the meaning of the Act if she can return to her PRW as it is customarily performed in the economy or as she actually performed the work. *Id*.

Plaintiff worked as a medical lab technician from May 1995 to August 1995. Tr. 69. Based on the DOT entry for this job, Plaintiff argues that this three-month stint was insufficient for it to qualify as her PRW. *See* Pl.'s Br. 13–14; exh. A to Pl.'s Br. (attaching DOT entry for job of a medical lab technician (DOT #078.381-014)). Plaintiff explains that the DOT indicates that the job of medical lab technician has a Specific Vocational Preparation ("SVP") level of 5, which takes the "typical" worker "over six months and up to one year to learn." Pl.'s Br. 13–14 (quoting DOT, Entry #078.381-014).

Also citing to the DOT, the Commissioner counters that Plaintiff's Associate of Science degree in medical laboratory technology, (*see* Tr. 253), may be considered in determining the SVP for a position. The DOT explains that a job's SVP includes "vocational education" and "that part of college training which is organized around a specific vocational objective." Def.'s Br. 17 (*quoting* DOT App'x C). The Commissioner also notes that, when working as a medical laboratory technician, Plaintiff was registered with the American Society for Clinical Pathology. *See* Def.'s Br. 17, Tr. 75. Because Plaintiff holds a two-year college degree in medical laboratory technology and professional certification in medical laboratory technology, the Commissioner argues that Plaintiff had the requisite vocational training—the SVP—to do the job. Accordingly, the Commissioner argues that the ALJ properly considered Plaintiff's work as a medical laboratory technician her PRW.

On reply, Plaintiff claims that vocational-related education may not be considered as "work experience" except when a claimant cannot do her prior work. Pl.'s Reply 1–2 (*citing* SSR 83-10).

The court agrees with the Commissioner. Although neither party cites case law or other authority on this precise issue and the court's independent research has not revealed any, the court finds that the ALJ properly characterized Plaintiff's PRW as including her position as a medical lab technician. Plaintiff correctly cited to the DOT's definition of SVP. However, on reply, Plaintiff seeks to have the court ignore the very next paragraph

of Appendix C, on which the Commissioner relies.  The relevant portion of Appendix C

of the DOT regarding SVP follows:

## II.    SPECIFIC VOCATIONAL PREPARATION (SVP)

Specific Vocational Preparation is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.

This training may be acquired in a school, work, military, institutional, or vocational environment. It does not include the orientation time required of a fully qualified worker to become accustomed to the special conditions of any new job. Specific vocational training includes: vocational education, apprenticeship training, in-plant training, on-the-job training, and essential experience in other jobs.

Specific vocational training includes training given in any of the following circumstances:

a. Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);

b. Apprenticeship training (for apprenticeable jobs only);

c. In-plant training (organized classroom study provided by an employer);

d. On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);

e. Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

* * *

DOT App'x C.

Plaintiff's degree qualifies as occupational-related education may be considered as a portion of her training as a medical lab technician for purposes of the SVP. The ALJ appropriately characterized Plaintiff's medical-lab-technician employment as PRW.

>   2.     The ALJ Properly Considered Plaintiff's Past Work Duties and her RFC in Finding She Could Return to PRW.

Next, Plaintiff complains that the ALJ did not comply with SSR 82-62 because she did not specifically question Plaintiff during the hearing about the details of her duties at her prior relevant positions. Plaintiff also claims that the ALJ did not adequately examine her PRW in view of the RFC the ALJ found Plaintiff had. Pl.'s Br. 14–16; Pl.'s Reply 2–4. These arguments require separate focus on the following: (a) whether the ALJ properly considered and identified what Plaintiff's PRW as a medical lab technician and security guard were; and (b) whether substantial evidence supports the ALJ's finding that Plaintiff could still perform these two prior jobs based on the RFC.

>   3.     The Scope of Plaintiff's PRW

SSR 82-62 provides that the following sources may be consulted in determining whether a claimant can return to prior relevant work (PRW):

>   The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of

Occupational Titles, etc., on the requirements of the work as generally performed in the economy.

SSR 82-62. Plaintiff focuses on the beginning of this paragraph, claiming that ALJ did not obtain appropriate information about her prior work as a medical lab technician because she "was never questioned about the need to interact with others at this past work [as a medical lab technician]." Pl.'s Br. 15.

Responding to the first concern—that the ALJ did not question Plaintiff about whether she interacted with others as a medical lab technician—the Commissioner claims it is irrelevant that the ALJ did not question Plaintiff at length about the specific requirements of her past because SSR 82-61 provides that a claimant will be found not disabled if she "retains the RFC to perform" the "actual functional demands and job duties" of her particular PRW or "[t]he functional demands and job duties of the occupation as generally required by employers throughout the national economy." SSR 82-61. Def.'s Br. 18.

The court agrees with the Commissioner. Plaintiff concedes that the Commissioner may call upon a VE to offer relevant evidence to "help determine whether the claimant's RFC is consistent with the past work[,]" but argues that it is error for the VE to supply the demands of the past work. Pl.'s Reply 3 (*citing* 20 C.F.R. § 404.1560(b)(2) and SSR 82–62. Review of the ALJ's decision, and colloquoy with the VE at the hearing, and Plaintiff's testimony reveals that she considered the demands of Plaintiff's PRW as required.

The ALJ found the following regarding Plaintiff's ability to perform her PRW:

**6.  The claimant is capable of performing past relevant work as a medical lab tech or a security guard. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).**

The VE testified that claimant's past relevant work required the following exertion, had the following DOT numbers and had the following skill levels: refrigeration tester, DOT # 827.384010, light and skilled, with SVP of 5; lab tech (incorporates jobs of lead utility and boroscope job) DOT # 029.361-018, light and skilled, SVP of 6 in a very broad category; press operator, DOT # 619.685-062, medium and semi-skilled with SVP of 3 as described, but light as claimant performed it; medical lab tech, DOT # 078.381-014, light and skilled, SVP of 5; security guard, DOT # 372.667-038, light and semi-skilled, SVP of 3.

Claimant testified she worked as a security guard in 1997 for four or five months. She worked second shift and walked through the plant at night. Sometimes she worked during the day. She sat behind the glass and sometimes had to "enter stuff" on the computer. She did not have to talk to people much. She remembered entering data on computer about their attendance. The vocational expert testified she performed this job long enough to demonstrate the ability to do it, and I find it was past relevant work.

In my first hypothetical, I asked the VE to assume an individual of the claimant's age, education and work history who had moderately to moderately severe hearing loss of 80% on the right and 45% in the left ear and who needed jobs in which there was little to no conversation required. The VE testified the individual could do claimant's past jobs as a security guard, press operator, medical lab tech and in refrigeration.

In a second hypothetical, I asked the VE to assume the same limitations, but that the individual also needed to avoid very dirty air and dangerous environments so that she could take care to protect herself if she could not hear. The VE testified that she could still do the work as a security guard or medical lab technician.

In comparing the claimant's residual functional capacity with the physical and mental demands of this work, I find that the claimant is able to perform it as actually and generally performed.

Tr. 29 (bold emphasis in original). Further, at the hearing, the ALJ asked Plaintiff why she left her position as a medical lab technician. Plaintiff responded that it was because "they were in violation of all the clinical laboratory improvements acts," and the "office manager would not listen to [her]." Tr. 263. *See also* Tr. 28 (ALJ's decision recounting discussion with Plaintiff about the medical lab technician job). Plaintiff also said she left the position because she had "decided that that was not the only place where money could be made." Tr. 263–64. Plaintiff did not mention that any of her claimed impairments or symptoms caused her to leave that job.

In considering Plaintiff's claim of error, the court is mindful that it is Plaintiff's, not the Commissioner's burden to establish that she could not perform her PRW. *See Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995); *Hunter v. Sullivan*, 993 F.3d 31, 35 (4th Cir. 1992). Plaintiff's last two jobs—as a refrigeration tester and a laboratory assistant—were both light, skilled jobs according to the VE and the DOT. Tr. 285. She worked as a refrigeration tester from April to November 2003 and left for non-health-related reasons. Tr. 70, 100, 285. Prior to that job, from July 1998 to September 2002, she worked as a lab technician (laboratory assistant). That job, too, ended for reasons unrelated to her health: she testified that she left the job because her employer moved her from a quality-control position to a "processing" position, which involved "lifting 50-pound parts eight hours a day." Tr. 71, 260, 285.

Plaintiff was diagnosed with polycythemia in 1997 and has had hearing loss for about twenty years. She has not produced any evidence that her hearing or the effects of her polycythemia have worsened since 2003. If a claimant works for years with her impairments, her impairments are not disabling absent a worsening of her condition. *See Cauthen v. Finch*, 426 F.2d 891, 892 (4th Cir. 1970) (finding evidence a claimant worked despite long-standing impairment may be substantial evidence the impairment is not disabling).

The light, skilled job of medical lab technician, which the ALJ found Plaintiff could perform, has the same requirements with regard to interpersonal contact and exposure to noise and hazards as the jobs of laboratory assistant (i.e., lab technician) and refrigeration tester. According to the DOT, none of these three jobs involve significant contact with people; all three involve "moderate" exposure to noise; and none involves exposure to hazardous conditions. *See* DOT Job Titles 827.384-010 (Refrigeration Tester), 029.361-018 (Laboratory Assistant), and 078.381-014 (Medical Laboratory Technician). The DOT description of the medical lab technician job indicates that a "hearing" requirement is "not present." *Id.* The job of medical lab technician does not require significant contact with others or exposure to dangerous conditions. *See* DOT #078.381-014. The job involves moderate exposure to noise, but hearing is not a significant function.

Based on the ALJ's questioning of the VE, the VE's testimony regarding the DOT descriptions of Plaintiff's PRW, and the ALJ's detailed findings regarding medical

evidence and Plaintiff's credibility (discussed within), Plaintiff has not established she is unable to perform her PRW as a medical lab technician as it is performed in the economy. Plaintiff's allegation of error on this point is without merit.

Regarding the security guard position that the ALJ found Plaintiff can still perform, the above-quoted passage from the ALJ's decision indicates she obtained detailed information from Plaintiff about that job as she performed it. Tr. 29. In her questioning of the VE, the ALJ further clarified that she was focused on that job with the duties as Plaintiff had performed it—that is, working during the day, so that she would not need to be concerned about "someone sneaking up on her," but she would need to be aware of hazardous machinery. Tr. 286. The VE testified that the functional restrictions set out in the ALJ's hypothetical would not impede someone's performing the security guard position as Plaintiff testified she had performed it. Tr. 287. The court notes, however, that the Commissioner effectively concedes that "the job of security guard exceeds Plaintiff's residual functional capacity . . . because it requires significant contact with people and exposure to dangerous situations[.]" Def.'s Br. 16. Accordingly, the court will not further consider whether the ALJ's finding that Plaintiff could perform her PRW as a security guard is supported by substantial evidence. The burden of proving inability to return to PRW remains with Plaintiff. So long as the ALJ's finding that Plaintiff can return to one of her past-relevant-work positions—in this case as a medical lab technician—the court must uphold the ALJ's decision as being supported by substantial evidence.

E.    The Commissioner's Failure Strictly to Follow SSR 00-4p as to PRW as a Medical Lab Technician is Harmless Error.

Plaintiff's last allegation of error regarding the ALJ's decision regarding PRW is that the ALJ did not ask the VE whether his testimony was consistent with the DOT, as SSR 00-4p requires.  Pl.'s Br. 4–5.  In his response, the Commissioner concedes that the ALJ did not ask the VE the specific question SSR 00-4p requires.  However, the Commissioner claims that such error is harmless because Plaintiff has not identified any conflict between the VE's testimony and the DOT's job description concerning the requirements of her past job as a medical lab technician.  Def.'s Br. 18.  The Commissioner does not focus on PRW as a security guard on this point.  *See id.*

SSR 00-4p sets out the ALJ's duty to ask the VE to identify and explain any conflicts with the DOT and provides as follows, in relevant part:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency. Neither the DOT nor the VE or VS evidence automatically "trumps" when there is a conflict. The adjudicator must resolve the conflict by determining if the explanation given by the VE or VS is reasonable and provides a basis for relying on the VE or VS testimony rather than on the DOT information.

SSR 00-4p.  The ALJ is to obtain a reasonable explanation for any "apparent unresolved conflict" between the VE evidence and the DOT before relying on the VE to support a determination about whether the claimant can perform work.  *Id.*  A VE's testimony that

conflicts with the DOT may be used only if the ALJ finds that it is based on "other reliable publications" or the VE's "experience in job placement or career counseling." SSR 00-4p; *see also Fisher v. Barnhart*, 181 Fed. App'x 359, 365-66 (4th Cir. 2006) (unpublished).

In her decision, the ALJ noted that she found "no conflict between the information provided by the VE and the occupational information in the Dictionary of Occupational Titles (SSR 00-4p)." Tr. 29. The court agrees with Plaintiff that such a statement alone does not satisfy the SSR 00-4p requirement. Nonetheless, the court agrees with the Commissioner that the failure to discuss any conflict between the VE's testimony and the DOT regarding Plaintiff's PRW as a medical lab technician was harmless error.

As set out in more detail above, the VE testified that someone with the functional limitations the ALJ found for Plaintiff could still perform the prior relevant work as a medical lab technician as it was performed in the national economy. That analysis necessarily considered whether there was any conflict between the DOT's description of that job and its nonexertional requirements and the nonexertional requirements the ALJ placed on Plaintiff. Plaintiff's argument on reply is that the DOT entry for a medical lab technician "confirms that Coleman would have to draw blood, which would involve contact with people, hearing, and exposure to hazards." Pl.'s Reply 5 (citing generally to DOT #078.381-014). However, this characterization is merely argument of Plaintiff's counsel that is not supported by the plain language in the DOT description of the position.

As detailed above, that description indicates that this position's contact with people is "Not Significant." When asked whether someone with the limitations identified in Plaintiff's RFC could perform any of her past work, the VE testified that such a hypothetical person could perform work as a medical lab technician with DOT #078.381-014. Tr. 285–86. Plaintiff has not demonstrated there was a conflict between the questioning of the VE and the DOT description of Plaintiff's PRW as a medical lab technician.

Accordingly, the court agrees that the ALJ's failure to expressly ask that the VE consider whether there was any discrepancy was harmless error. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless when ALJ would have reached the same result notwithstanding an error in his analysis); *see also Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (finding ALJ's failure to ask about conflict between vocational expert testimony and DOT was harmless error because no conflict existed); *Boone v. Barnhart*, 353 F.3d 203, 209 (3d Cir. 2003) (an ALJ's failure to discover and explain conflict between vocational expert testimony and DOT does not necessarily require reversal).

The ALJ's finding that Plaintiff can perform her prior relevant work as a medical lab technician based on the RFC limitations set out is supported by substantial evidence. Plaintiff has not satisfied her burden of demonstrating otherwise.

    F.    The ALJ's Findings as to Plaintiff's RFC are Supported by Substantial Evidence.

The ALJ found that Plaintiff can perform "a full range of work at all exertional levels but with the following nonexertional limitations: a limitation to little or no personal interaction or conversation with others required on the job; the need to avoid very dusty air; the need to avoid dangerous situations; and the need to avoid excessive noise." Tr. 23. Plaintiff challenges these RFC findings, claiming they are not supported by the evidence of record. Pl.'s Br. 21–27. The Commissioner claims that the RFC decision is supported by substantial evidence. Def.'s Br. 19–21. The court agrees with the Commissioner.

Plaintiff first focuses on her mental health records, specifically the opinions of two consulting psychologists—Dr. Ruffing and Dr. Tollison. Pl.'s Br. 17–21; Pl.'s Reply 5–6. Plaintiff's principal argument is that the ALJ "rejects one expert's opinion and appears to accept the other's, but the reasons for this selection are not supported by substantial evidence." Pl.'s Br. 17.

The court finds that the record evidence, considered as a whole, supports the ALJ's findings as to Plaintiff's capacity for work. Dr. Ruffing, an examining psychologist, found that Plaintiff "would have some limitations in maintaining socially appropriate and predictable behavior," but could "likely perform repetitive tasks and can understand, remember, and carry out detailed instructions" (Tr. 175). This conclusion supports the ALJ's finding that Plaintiff could "attend to and perform simple tasks without special supervision." Tr. 23. In fact, the ALJ's restriction on Plaintiff's capacity—that Plaintiff could have "little or no personal interaction or conversation" was even more restrictive

than Dr. Ruffing's finding of "some limitations" in maintaining socially appropriate behavior.

Plaintiff recounts the examinations of Dr. Ruffing and Dr. Tollison and argues that the ALJ erred by accepting the opinion of Dr. Ruffing and rejecting Dr. Tollison's findings that Plaintiff is disabled. However, that one examining psychologist reaches a different opinion than another does not translate into reversal of the ALJ's findings. In fact, for purposes of review under the substantial evidence standard, "it is immaterial that eight medical witnesses disagreed with the ALJ's conclusion, provided that one such witness gave sufficient probative evidence." *Millner v. Schweiker*, 725 F.2d 243, 245 (4th Cir. 1984).

In addition, the ALJ properly stated in her decision that she owed no deference to Dr. Tollison's opinion that Plaintiff was unable to work. Tr. 15; *see also* Def.'s Br. 20. Determinations regarding whether a claimant is "disabled" and related legal conclusions are administrative determinations for the Commissioner and not for medical personnel. 20 C.F.R. § 404.1527(e) (noting certain opinions by medical sources—such as being "disabled" or "unable to work"—are not afforded "special significance"); *see Morgan v. Barnhart*, 142 F. App'x 716, 721-22 (4th Cir. 2005) (unpublished) (distinguishing between medical opinions and legal conclusions by physicians that claimant is unable to work or disabled, finding the latter are matters reserved to the Commissioner and are not entitled to heightened evidentiary value). The ALJ did not err by discounting Dr. Tollison's opinion that Plaintiff was disabled.

The ALJ gave valid reasons for discounting Dr. Tollison's opinion. Tr. 28-29. For example, she examined his interpretation of the MMPI results, which showed only moderate limitations of function in some areas, with Dr. Tollison's opinion that Plaintiff was "severely limited" and could no longer work. She also found Dr. Tollison's findings were inconsistent with findings by Dr. Ruffing. Tr. 28. The consistency of a medical source's opinion with other evidence and the extent to which the opinion is supported by objective findings are important considerations in evaluating medical opinion evidence. *See* 20 C.F.R. § 404.1527(d). Thus, the ALJ reasonably resolved the conflict between Dr. Ruffing's and Dr. Tollison's opinions in determining Plaintiff's RFC. *See Shively v. Heckler*, 739 F.2d 987, 990 (4th Cir. 1984).

Further, the evidence supports the ALJ's finding that Plaintiff be limited to a work atmosphere with "little-to-no personal interaction or conversation with others." The ALJ analyzed the medical evidence and considered it along with other evidence. In her detailed discussion of Plaintiff's credibility, for example, the ALJ noted that claimant's statements to Dr. Tollison and her description of social interaction "exaggerated her allegation of inability to get along with others." Tr. 22. She also considered the findings of Dr. Ruffing and Dr. Tollison that she had "intact mastery of cognitive functioning" (Dr. Ruffing) and that she was capable of managing her own finances (Dr. Tollison). Tr. 23.

The ALJ's decision was express and thorough. Although Plaintiff may disagree with the ALJ's determination and may cite some record evidence to the contrary, the

court is constrained to affirm the ALJ's decision so long as substantial evidence of record supports that decision. *See Blalock*, 483 F.2d at 775 ("The fact that the record as a whole might support an inconsistent conclusion is immaterial, for the language of § 205(g) [of the Act] precludes a de novo judicial proceeding and requires that the court uphold the [Commissioner's] decision even should the court disagree with such decision as long as it is supported by 'substantial evidence.'" (footnotes omitted). Substantial evidence supports the ALJ's findings as to Plaintiff's RFC. Therefore, the court recommends the ALJ's findings be affirmed.

G.      The ALJ Appropriately Evaluated Plaintiff's Hearing Impairment.

Plaintiff also challenges the ALJ's finding that she was able to work but needed to "avoid excessive noise." Tr. 23. Plaintiff claims that this finding is not supported by substantial evidence and that it was not appropriately presented to the VE during the hearing. Pl.'s Br. 21–22. The Commissioner counters that substantial evidence does not support Plaintiff's claim that she is disabled because of a hearing loss and that the ALJ and VE appropriately considered the issue in the finding of nondisability. *See* Def.'s Br. 15. The court finds that the Commissioner's decision is supported by substantial evidence. Plaintiff's hearing loss has been documented for twenty years, yet she claims disability—including disability because of hearing loss—as of 2003. *See, e.g.,* Tr. 167 (Dec. 2004 RFC Assessment noting Plaintiff's "hearing loss first manifest[ed] in her 20's.") None of Plaintiff's treating physicians stated that she had more restrictive limitations on her hearing than those found by the ALJ. Dr. Hopkins and Dr. Clarke, the

only physicians who assessed Plaintiff's physical RFC, found she had no exertional limitations, but should avoid exposure to loud ambient environments and concentrated exposure to hazards and fumes, odors, and gasses. Tr. 163–70. In addition, on January 23, 2006, Audiologist Lynn Lehman tested Plaintiff's hearing at the request of Plaintiff's attorney and found that "at an optimal loudness level," Plaintiff's speech discrimination was 80% in the right ear and 45% in the left. Tr. 199. The ALJ mirrored Dr. Lehman's findings in the her questioning of the VE.

The ALJ's questions to the VE included the following restriction: assume "claimant has moderately severe to severe sensory neural hearing loss with speech discrimination 80 percent in the right ear, 45 percent in the left." Tr. 285. Plaintiff argues that this was insufficient, though. Pl.'s Br. 21. Plaintiff fails to mention, however, that the ALJ also instructed the VE to assume the following restriction related to hearing:

> that [Plaintiff] needs to avoid very dirty air and dangerous environments so that if, you know, she could take care to protect herself if she couldn't hear it. If there was [sic] vehicles coming along and, you know, things out of control so that people had to hear things and get out of the way, that wouldn't be appropriate for her, okay.

Tr. 286. Plaintiff claims that the question to the VE did not convey what "excessive noise" was and did not take into account the hearing-loss decision of the ALJ. The court does not agree. Although the ALJ's wording of the hypothetical question did not verbatim follow the RFC limitation she set out, she conveyed to the VE the conditions she found Plaintiff's hearing loss to impose on her RFC.

The ALJ enjoys "some discretion to craft hypothetical questions to communicate to the vocational expert what the claimant can and cannot do." *Fisher v. Barnhart*, 181 Fed. App'x 359, 364 (4th Cir. 2006) (unpublished opinion). Additionally, hypothetical questions should "adequately reflect" a plaintiff's RFC that the ALJ has determined to be supported by sufficient evidence. *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005). Further, the questions must "fairly set out all of claimant's impairments." *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989).

Here, the ALJ's questions to the VE fairly indicate Plaintiff's hearing issue and reflect the RFC. The VE's responses provides substantial evidence that Plaintiff could perform her PRW discussed above in a manner in keeping with the RFC the ALJ set out. Plaintiff's allegation of error on this point is without merit.

H.    The ALJ Adequately Evaluated Plaintiff's Polycythemia and COPD.

Next, Plaintiff claims the ALJ erred by not finding her polycythemia and COPD to cause her exertional limits despite having found these to be "severe" impairments. Pl.'s Br. 22. Without much discussion, Plaintiff's argument seems to be that because an impairment is found to be "severe" at Step Two of the sequential evaluation, it necessarily follows that the ALJ must find some work-related limitation as a result of these "severe" impairments and that the ALJ erred by failing to do so. *Id.*

This argument overstates the law. For purposes of step two of the sequential analysis the Commission performs, regulations define a "severe" impairment as one that may "significantly limit" one's ability to basic work activities. *Cf.* 20 C.F.R. §

404.1521(a). However, it does not necessarily follow that a "severe" impairment must result in disability or a functional limitation on a plaintiff's ability to work. Rather, at step three, the ALJ is to determine whether any of the "severe" impairments satisfy any of the Commissioner's "listed" impairments. If they do, then a finding of disability is required and the analysis may end. *See* 20 C.F.R. § 404.1520(a)(4). However, if the impairment[s] do not mean disability under the listings, the Commissioner then moves on to the next steps of the analysis. The remaining steps require the Commissioner to consider a plaintiff's impairments and complaints of record and determine the claimant's RFC. *See* SSR 96-8p (discussing need for RFC assessment at steps four and five). Having determined the RFC, the Commissioner is to decide whether a claimant may return to his PRW. If the claimant cannot, the Commissioner then is to determine whether there is any work the claimant can perform. In determining a plaintiff's RFC, the ALJ is to consider whether plaintiff's complaints are credible and what, if any, impact the complaints have on her ability to work. *See Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). In other words, a plaintiff can have "severe" impairments that could cause symptoms, but that the ALJ determines incredible in evaluating the claimant's complaints.

In this case, the ALJ reviewed medical evidence regarding Plaintiff's polycythemia and COPD at length. The ALJ examined Plaintiff's complaints that polycythemia caused her to "feel weak and tired and to have diarrhea[,]" as well as claims that "breathing problems prevent her from running 'a long time with her dog.'" Tr. 26.

She noted that Plaintiff continues to smoke despite having been told by doctors that it "is the major factor contributing to the severity of polycythemia." *Id.* However, as required by regulations and case law, the ALJ went on to consider Plaintiff's credibility as to whether these complaints actually impacted her ability to perform work. *Id.* Additionally, the ALJ included a breathing-related restriction on Plaintiff's ability to work by finding Plaintiff's RFC limited by the "need to avoid very dusty air[.]" Tr. 23.

Plaintiff's allegation of error citing to Plaintiff's complaints that the ALJ plainly considered does nothing to change the court's determination that the ALJ's findings are supported by substantial evidence. Plaintiff has not satisfied her burden of proving her RFC is more limited than the RFC the ALJ found. *See Baldwin v. Barnhart*, 349 F.3d 549, 556 (8th Cir. 2003).

## I.     The ALJ Properly Considered Plaintiff's Credibility.

Plaintiff's final allegation of error is that the ALJ did not conduct an appropriate review of the evidence in determining Plaintiff's credibility. Pl.'s Br. 23–28. "The determination of whether a person is disabled by pain or other symptoms is a two-step process." *Craig*, 76 F.3d at 594. First, a threshold determination is made as to whether objective medical evidence shows the existence of a medical impairment which could reasonably be expected to produce the symptoms alleged. *Id.* Then, the ALJ must evaluate the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work. *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). This evaluation must take into account not only the claimant's statements, but also "all the

available evidence," including the claimant's medical history, medical signs, and laboratory findings . . . and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. 76 F.3d at 595. Inconsistencies between a claimant's testimony and other evidence may support a finding that the claimant is not fully credible. *See Hunter v. Sullivan*, 993 F.2d 31, 36 (4th Cir. 1993). Because an ALJ has the opportunity to observe the claimant's demeanor, the reviewing court should give the ALJ's credibility determination "great weight." *See Shively v. Heckler*, 739 F.2d 987, 889 (4th Cir. 1984).

Here, the ALJ properly set out the standard she was to follow, implicitly found that Plaintiff's impairments could reasonably be expected to produce her alleged symptoms, and proceeded to evaluate all of the evidence in evaluating her credibility. Tr. 24–28. The ALJ thoroughly considered the factors relevant to credibility and devoted approximately four pages of her decision to evaluating Plaintiff's credibility in light of all record evidence. *See* Tr. 24–28. The ALJ considered Plaintiff's daily activities as reported to Dr. Ruffing, Dr. Tollison, and at the hearing. Tr. 25. She specifically noted that Plaintiff she was able to drive, shop, engage in hobbies such as furniture stripping, participate in meal preparation and household chores, care for her dog, do laundry, wash dishes, play pool, and go motorcycle riding with her husband. Tr. 25–26.

The ALJ also noted that "[a]n important further factor" in her assessment of Plaintiff's credibility and functional impairments is "the fact that while [Plaintiff] has

described a chronic mental illness throughout her adult life, and is diagnosed with a personality disorder (by definition a lifelong problem) she managed to work for many years without apparent difficulty." Tr. 26. The ALJ further noted that "[t]he record does not show any clear down-turn in her function in 2005." *Id.* She further indicated that, although Plaintiff seemed "histrionic and odd," those "character traits and behaviors did not affect her ability to work for years and years; absent some reason to conclude major deterioration, it would seem that emotional distress is not as upsetting to her as she claims." *Id.*

The ALJ also noted that Plaintiff continued to smoke cigarettes despite her physicians' warnings that it was a major contributing factor to her polycythemia. Tr. 26. *See Mayle v. Astrue*, No. 9:06-3048-CMC-GCK, 2007 WL 4285383, *21 (D.S.C. Dec. 3, 2007) (finding ALJ properly considered claimant's purchase of cigarettes and alcohol when considering credibility). Further, she considered and compared the inconsistent testimony regarding Plaintiff's marijuana use in considering credibility. Plaintiff told the ALJ she had not used marijuana since she was seventeen, she told Dr. Ruffing that she had used it a few months before her January 2005 examination, and she told Dr. Tollison in February 2006 that she continued to use it occasionally. Tr. 27. Undoubtedly, inconsistencies such as these may support an ALJ's finding that a claimant is not fully credible. *See Hunter*, 993 F.2d at 36.

The ALJ also found Plaintiff's ability to hear her questioning of the VE in a normal conversational tone to be inconsistent with Plaintiff's claimed inability to hear the

ALJ unless she shouted.  Tr. 27.  The ALJ found this inconsistency "greatly affect[ed] her credibility in an adverse manner." Tr. 27.

Thus, the ALJ thoroughly considered the record as a whole and gave valid reasons for finding Plaintiff's allegations concerning the severity of her symptoms not credible. Tr. 28.  That some of the evidence could have theoretically supported a different finding, as Plaintiff's arguments suggest, is irrelevant. "Credibility is the province of the ALJ." *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1499 (10th Cir. 1992). A reviewing court should "generally treat credibility determinations made by an ALJ as binding upon review" where, the ALJ has given specific, legitimate reasons for disbelieving the claimant's testimony. *Gosset v. Bowen*, 862 F.2d 802, 807 (10th Cir. 1988).

Plaintiff's arguments that the ALJ did not appropriately consider her credibility in evaluating her claims offer little more than a re-hash of her claim that the ALJ's findings as to her RFC and disability are not supported by substantial evidence.  The court finds that the ALJ appropriately considered the record as a whole and performed the required analysis of Plaintiff's impairments, including her subjective complaints.  Plaintiff has not established entitlement to reversal or remand.

III.    Conclusion and Recommendation

 The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court finds that the Commissioner performed an adequate review of

the whole record, including evidence regarding Plaintiff's mental and physical conditions, and the decision is supported by substantial evidence.

Accordingly, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under Section 205(g), sentence four, and Section 1631(c)(3) of the Act, 42 U.S.C. Sections 405(g) and 1383(c)(3), it is recommended that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

July 16, 2010                                         Shiva V. Hodges
Florence, South Carolina                             United States Magistrate Judge

**The parties are directed to note the important information in the attached**
**"Notice of Right to File Objections to Report and Recommendation."**