**IN THE DISTRICT COURT OF THE UNITED STATES**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**AIKEN DIVISION**

| | | |
|---|---|---|
| Marcia Coleman, | ) | Civil Action No. 1:09-659-MBS |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **ORDER AND OPINION** |
| Michael J. Astrue, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

On March 16, 2009, Plaintiff Marcia Coleman filed the within action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). Plaintiff seeks judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act"). In accordance with 28 U.S.C. § 636(b) and Local Rule 73.02, D.S.C., this matter was referred to United States Magistrate Judge Shiva V. Hodges for pretrial handling. On August 31, 2009, Plaintiff filed her brief addressing the issues in the case. On October 13, 2009, Defendant filed a Memorandum in Support of the Commissioner's Decision. On October 30, 2009, Plaintiff filed a reply brief. On July 16, 2010, the Magistrate Judge filed a Report and Recommendation recommending that the Commissioner's decision to deny benefits be affirmed. On August 11, 2010, Plaintiff filed objections to the Report and Recommendation. On August 23, 2010, Defendant responded to Plaintiff's objections.

The Magistrate Judge makes only a recommendation to this court. The recommendation has no presumptive weight. The responsibility for making a final determination remains with this court. *Mathews v. Weber*, 423 U.S. 261, 270 (1976). The court may accept, reject, or modify, in whole or

in part, the recommendation made by the Magistrate Judge or may recommit the matter to the Magistrate Judge with instructions. 28 U.S.C. § 636(b)(1). The district court is obligated to conduct a *de novo* review of every portion of the Magistrate Judge's report to which objections have been filed. *Id.*

## I. FACTS

On August 23, 2004, Plaintiff filed applications for DIB and SSI, alleging disability beginning on November 30, 2003. R. at 62. Plaintiff alleged in her application that she was disabled due to polycythemia, hearing loss, COPD, and depression. R. at 42. On February 11, 2005, Plaintiff's claim was denied. R. at 39, 234. On April 27, 2005, Plaintiff's claim was denied again upon reconsideration. R. at 38, 230. On May 16, 2005, Plaintiff timely requested a hearing on her application. R. at 35, 229. On September 25, 2007, a hearing was held before an ALJ at which medical documents were admitted as exhibits; and Plaintiff and G. Mark Leaptrot, a vocational expert, testified. R. at 246-47.

### A. Medical Evidence

The medical evidence submitted to the ALJ for consideration reveals the following. On November 4, 2002, an audiologist completed a hearing disability report on Plaintiff indicating that she began losing her hearing in her 20s, needed hearing aids, and that she was restricted to occupations in which hearing is not a "crucial necessity." R. at 115. On November 11, 2002, Plaintiff presented to Christopher D. Rucker of the Spartanburg Ear, Nose and Throat clinic. R. at 110-111, 113. Dr. Rucker noted that Plaintiff had sensorineural hearing loss, and a normal mood with unremarkable affect. R. at 111. On April 4, 2003, Plaintiff presented to an unknown physician who noted that Plaintiff was not hearing as well, had moderate to severe and severe sensorineural

hearing loss, had poor discrimination and had a significant loss in pure tones. R. at 112.

In October 2003, Colin Curran, M.D. ("Curran") performed an initial evaluation of Plaintiff. R. at 141. Plaintiff reported being diagnosed with polycythemia rubra vera ("polycythemia") in 1997 by a Dr. Dugen in Indianapolis, Indiana. R. at 141. Plaintiff indicated that she had not had regular medical care since 2002. R. at 141. Plaintiff denied visual changes, headaches, neurological symptoms, pruritus, and abdominal bloating. R. at 141. Plaintiff's primary problem was diarrhea, which she reported having three to four times daily for several years. R. at 141. Plaintiff reported that her hearing had been decreased since her early 20s. R. at 141. Plaintiff indicated that she had smoked one pack of cigarettes per day for the past fifteen years, but denied any use of drugs or alcohol. R. at 142. Plaintiff reported that her father died of colon cancer at age 30. R. at 142, 147. Upon examining Plaintiff, Curran noted that Plaintiff was obviously hard of hearing, and diagnosed her with diarrhea and probable polycythemia. R. at 142. Curran referred Plaintiff to a gastroenterologist for her diarrhea, prescribed her with Hydra, and tested her for polycythemia. R. at 142-43. On November 10, 2003, Curran gave Plaintiff a bone marrow aspiration and biopsy. R at 139. Plaintiff then had a phlebotomy to treat possible polycythemia. R. at 138.

On November 24, 2003, Plaintiff had a followup visit with Curran regarding her bone marrow biopsy and phlebotomy. R. at 138. Plaintiff reported that she had more energy after the phlebotomy. R. at 138. Curran concluded that Plaintiff's symptoms were consistent with polycythemia, but also that there were concerns of lung disease. R. at 138. On December 28, 2003, Plaintiff presented to Curran for a followup visit. R. at 137. Curran noted that Plaintiff had experienced "nice improvement" in her symptoms after two phlebotomies and specifically that her diarrhea has almost completely resolved. R. at 137. Curran further noted that a pulmonary function

test indicated that Plaintiff had mild to moderate obstructive airway disease. R. at 137. Curran made clear to Plaintiff that smoking was not in her best interests and urged her to stop in the strongest possible terms. R. at 137. Plaintiff denied having any new symptoms at this visit. R. at 137.

On March 29, 2004, Curran noted that Plaintiff had no new symptoms and was having weekly phlebotomies. R. at 135. Plaintiff's chest was mostly clear with a "slightly prolonged expiratory phase," and Curran again urged Plaintiff to quit smoking. R. at 135. On April 26, 2004, Plaintiff was generally asymptomatic and had reduced her smoking. R. at 134. On May 24, 2004, Plaintiff reported to Curran with cold symptoms and upper respiratory congestion. R. at 132. Chest x-rays revealed hyperinflation with depressed diaphrams, fibrocalcific granulomatous scarring, and chronic obstructive pulmonary disease (COPD). R. at 132. On June 28, 2004, Plaintiff had no new complaints, was having periodic phlebotomies, and was down to six cigarettes a day. R. at 131. Curran noted that Plaintiff's obstructive airway disease was related to tobacco abuse. R. at 131. On August 4, 2004, Plaintiff told Curran that she had recently lost her job and was having personal problems including childhood memories of her father committing suicide. R. at 130. Plaintiff was sent for another phlebotomy. R. at 130. On August 20, 2004, Plaintiff had another phlebotomy. R. at 129. At this visit, Plaintiff's lungs showed "diminished breath sounds bilaterally with a prolonged expiratory phase." R. at 129. Plaintiff asked Curran if her hearing loss was related to polycythemia vera and was told "no." R. at 129. Curran told Plaintiff to see an Ear, Nose and Throat specialist for evaluation of her hearing loss. R. at 129. On September 17, 2004, Plaintiff had a phlebotomy to which she responded nicely. R. at 128. In his notes, Curran noted that Plaintiff had polycythemia, chronic hearing loss and COPD. R. at 128. Plaintiff maintained that her hearing loss was related to polycythemia, but Curran told her "this is not felt to be the case, especially in someone who is

relatively well controlled." R. at 128.

On October 27, 2004, Plaintiff was evaluated by Roger L. Compton ("Compton"), an audiologist. R. at 171. Compton indicated that Plaintiff had a "moderate severe to severe hearing impairment, bilaterally," which was more pronounced in the left ear. R. at 171. Compton indicated that although Plaintiff wears hearing aids, "she still experiences significant difficulty hearing/understanding conversational speech and accessing auditory information in general." R. at 171.

On December 7, 2004, William Hopkins ("Hopkins"), a State Agency medical consultant, completed a Physical Residual Functional Capacity ("RFC") Assessment on Plaintiff. R. at 163-70. Hopkins found that Plaintiff had polycythemia, which was "controlled fairly well with phlembotomies." R. at 164. Hopkins concluded that Plaintiff had no exertional limitations and that polycythemia had no impact on Plaintiff's RFC. R. at 164. With regard to Plaintiff's hearing, Hopkins found that Plaintiff had limited hearing due to senorineural hearing loss and that even with hearing aids, Plaintiff has difficulty with speech discrimination, especially in loud, ambient environments. R. at 167. Hopkins found that Plaintiff had COPD. R. at 167. Hopkins concluded that Plaintiff should avoid even moderate exposure to noise; avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, etc.; and avoid hazards. R. at 167. Hopkins noted that Plaintiff's hearing difficulties "will be exacerbated by exposure to loud ambient sound" and that this could also impair Plaintiff's "[a]bility to hear warning alerts." R. at 167.

On January 5, 2005, James Ruffing ("Ruffing") performed a Mental Status Exam on Plaintiff. R. at 173-76. Plaintiff reported that at age five, she found her father dead after he had shot himself. R. at 173. Plaintiff further reported that she had used marijuana within a few months prior to the

exam and that she smoked two to three packs of cigarettes each day. R. at 174. Ruffing noted that Plaintiff was adequately groomed and dressed, that she was hard of hearing, and that conversation was difficult because he had to repeat things. R. at 174. Ruffing's report states that it was difficult to keep Plaintiff on track with the discussion and that she tended to be "somewhat cynical if not sarcastic in her interpersonal style." R. at 174. Ruffing found Plaintiff to have a "[r]ather eccentric and unusual-type interpersonal style with what appeared to be, poor emotional regulation and bizarre-type behaviors." R. at 174. Plaintiff showed inappropriate affect sometimes acting silly and sometimes serious. R. at 174. Ruffing found that Plaintiff's thought processes were generally intact, but that her relevance was "loose" at times. R. at 174. Ruffing found no evidence of psychosis. R at 174. Ruffing provisionally diagnosed Plaintiff with cyclothymic disorder, noting that she had "[r]ather significant mood instability." R. at 175. Ruffing could not "get indication for clear manic episodes affecting her social/occupational and interpersonal life." R. at 174. Ruffing indicated that Plaintiff may be masking an underlying depression. R. at 174. Ruffing found indications for personality dysfunction with tendencies toward "possibly borderline or histronic-type functioning." R. at 175. Ruffing suspected that interpersonal relationships are problematic for Plaintiff due to her "poor emotional regulation" and "inappropriate affective presentation." R. at 175. Ruffing concluded that Plaintiff had some limitations in maintaining socially appropriate and predictable behavior, but that she could likely "perform repetitive tasks and can understand, remember, and carry out detailed instructions." R. at 175. Ruffing indicated that he thought Plaintiff could manage her finances appropriately, but that there were strong indications that Plaintiff may have poor judgment. R. at 175.

On February 3, 2005, Lisa Varner ("Varner"), a State Agency consultant, completed a

psychiatric review and Mental RFC assessment on Plaintiff. R. at 177, 180, 191-93. Varner found that Plaintiff had cyclothymic and dysthymic disorders. R. at 177, 180. Varner also found that Plaintiff has a: 1) moderately limited ability to understand and remember detailed instructions; 2) moderately limited ability to carry out detailed instructions; and 3) moderately limited ability to interact appropriately with the general public. R. at 191-92. Varner also assessed Plaintiff's functional limitations finding that Plaintiff has: 1) mild limitations in activities of daily living; 2) moderate limitations in maintaining social functioning; and 3) moderate limitations in maintaining concentration, persistence, or pace. R. at 187. Varner concluded that Plaintiff's "symptoms and impairments are severe[,] but would not preclude the performance of simple repetitive work tasks in a setting that does not require on-going interaction with the public." R. at 189, 193.

On January 23, 2006, Plaintiff was given an audiological evaluation by Dr. Lynn Lehman ("Lehman"). R. at 199. Lehman found that Plaintiff's speech reception thresholds to be in "good agreement with the pure tone averages bilaterally" and speech discrimination at an "optimal loudness level was found to be 80% in the right ear and 45% in the left ear." R. at 199. Lehman found that Plaintiff has moderately-severe to severe sensorineural hearing loss with more severe hearing loss in the left ear. R. at 199. Lehman recommended that Plaintiff continue to utilize hearing aids in both ears. R. at 199.

In February 2006, Dr. C. David Tollison ("Tollison") performed a psychological evaluation of Plaintiff. R. at 202. Plaintiff told Tollison that she was not receiving active medical care or taking prescription medications because "I don't have the money and I don't even have the motivation to do much of anything anymore." R. at 202. Plaintiff reported that she had an associates degree in medical laboratory technology. R. at 202. Plaintiff also reported her history of tobacco

use and indicated that she "may utilize marijuana once or twice per month, but . . . not every month. . . ." R. at 202-03. Tollison noted Plaintiff's history of hearing loss, and "shortness of breath on exertion" and stated that Plaintiff's report of her medical history was consistent with Ruffing's report. R. at 202. Plaintiff and Tollison spoke at length about Plaintiff's discovery of her father's body after he committed suicide. R. at 203. Tollison found that Plaintiff has difficulty trusting people and poor social skills. R. at 203. Tollison administered the Minnesota Multiphasic Personality Inventory (MMPI). R. at 204. Tollison found that the testing was statistically valid and that there was "no suggestion of test manipulation, magnification, embellishment or denial of her current and true level of psychological functioning." R. at 204. Tollison interpreted the MMPI results as evidencing "a moderate intensity of affective distress along with a moderate intensity of anxiety-related symptoms." R. at 204. Tollison stated:

> [Plaintiff] may struggle with long-standing feelings of dysphoric thought and dysthymic functioning. She may also tend to overly react and overly interpret multiple situations, misperceiving the motivation of others and reacting in a confrontational manner. She may tend to ruminate and dwell over situations, becoming increasingly agitated and angry. She may tend to engage in behaviors with little thought and consideration given to the consequences of her actions. She does appear to perceive the world as a hostile and threatening environment.

R. at 204. Tollison noted that it was unlikely that Plaintiff could "maintain a level of social sensitivity necessary to keep friends." R. at 204. Tollison's summary of conclusions on Plaintiff read as follows:

> Behaviorally, she presents with a consistent pattern of difficulty hearing voices, even at a higher level of volume. Psychologically, she presents with symptoms of cyclothymic disorder with some cycling of her moods between anger and agitation with cycles to depression. This diagnosis was initially made by Dr. Ruffing and results of my evaluation are consistent with that diagnosis. In addition, she presents with symptoms suggesting personality disorder with borderline, histrionic, and possibly some paranoid and schizoid features. MMPI testing is valid with test results

consistent with her psychological diagnoses, as outlined here.

> Based on my evaluation of the patient, review of the medical records, and results of objective psychological testing, it is my opinion [Plaintiff] does not exhibit the concentration, persistence or pace typically required in a work setting. It is highly unlikely the patient could interact effectively with colleagues, supervisors, and the general public. She exhibits a marked lack of social skills and sensitivity and she is highly suspicious of others. It is further unlikely she could complete a series of workdays without interruption from psychological symptoms. She has difficulty with her hearing and certainly this could prove to be a situation that endangers the patient as well as others in certain environments and situations. She has difficulty with anger and does not exhibit the ability to accept instructions and respond appropriately to criticism from supervisors. Work pressures, stresses, and demand situations are expected to result in further deterioration in psychological functioning. Her condition appears chronic in nature and is expected to continue over the next twelve or more months. If awarded funds, [Plaintiff] appears capable of managing funds.

R. at 205. Tollison diagnosed affective disorder (cyclothymic disorder), and personality disorder (borderline and histrionic features with possible paranoid and schizoid features), and a GAF score of 45.

On February 16, 2007, Plaintiff went to the Cancer Center of the Carolinas for an initial evaluation of polycythemia. R. at 217. Plaintiff indicated that she had stopped going to Curran because of insurance problems. R. at 217. Plaintiff reported that she had no shortness of breath. R. at 217. Plaintiff also reported that both her mother and father had been diagnosed with colon cancer. R. at 217. Dr. Kim Hont Yee ("Yee") noted that Plaintiff had a history of manic-depressive disorder, that Plaintiff was very manic on the day of her evaluation, and recommended that Plaintiff be referred to a psychiatrist. R. at 217. On March 16, 2007, Plaintiff returned to Yee for a follow-up visit. R. at 216. Yee noted that Plaintiff was behaving much better and did not appear to be in a "manic phase." R. at 216. Plaintiff began therapeutic phlebotomies and was advised to quit smoking. R. at 216. On April 13, 2007, Plaintiff reported that she was feeling well and had another

phlebotomy. R. at 215. On July 13, 2007, Plaintiff had a phlebotomy and reportedly was doing very well, but was still smoking heavily. R. at 214.

On September 17, 2007, Tollison performed a follow-up assessment of Plaintiff. R. at 225. Tollison noted Plaintiff's hearing loss and indicated that Plaintiff may do some lip reading. R. at 225. Tollison also noted Plaintiff's COPD and polycythemia diagnoses. R. at 225. Tollison's report states that both he and Ruffing diagnosed cyclothymic disorder while Yee opined that Plaintiff had manic-depressive disorder, but indicates that there is a thin distinction between the two. R. at 225. Plaintiff reported that she occasionally does things that do not make sense and cannot remember them clearly. R. at 225. Plaintiff stated "I can't remember things, I get things all confused, my mind isn't right." R. at 225. Tollison states that Plaintiff "exhibits a consistent lack of social sensitivity." R. at 225. With regard to Ruffing's evaluation of Plaintiff, Tollison states:

> As mentioned, Dr. Ruffing evaluated the patient in January 2005 and reported mood instability. Dr. Ruffing opined that the patient suffers a cyclothymic disorder and questions the possibility of a mass [sic] depression or dysthymic disorder. [Plaintiff] has no recall of having seen Dr. Ruffing in the past although a review of his records contains facts consistent with her history and my evaluation. Certainly I would agree with Dr. Ruffing in that the patient does exhibit a particularly [sic] mood instability with poor control over her thoughts, feelings and behavior. I would also agree with Dr. Ruffing that she suffers from cyclothymic disorder. However, in addition, she exhibits symptoms consistent with personality disorder with borderline, histrionic, paranoid, and schizoid features. MMPI testing conducted in Feb 2006 had valid test results consistent with her diagnoses.

R. at 226.

During the follow-up assessment, Tollison observed that Plaintiff alternated between smiling and crying throughout the evaluation and that her control over thoughts, feelings, and behaviors appeared poor. R. at 226. Tollison states that Plaintiff is "paranoid in thinking and suspicious of others, including this examiner as well as other examiners who have evaluated her in the past." R.

10

at 226. Tollison again administered the MMPI and found that the testing was "statistically valid with no suggestion of test manipulation or symptom magnification." R. at 226. The MMPI results indicated that Plaintiff is a "highly reactive and possibly overly reactive individual with poor coping skills and adaptive behaviors." R. at 226. In comparing the two MMPIs, Tollison stated that both profiles were statistically valid and were generally consistent. R. at 226. Tollison noted, however, that the new profile indicated a moderate increase in reactivity, and demonstration of a lack of coping skills and adaptive behaviors; as well as an elevation in the intensity of Plaintiff's anxiety. R. at 226. Tollison concluded that the results of the two evaluations and MMPI tests were consistent with manic-depressive disorder and cyclothymic disorder. R. at 227. Based upon all of this, Tollison opined that Plaintiff:

> is highly unlikely to be able to complete a series of workdays without interruption from psychological symptoms. She is expected to have difficulty working in coordination with others and interacting effectively with others. Her behavior at times could prove disruptive to the workplace. Work pressures, stresses, and demand situations are expected to result in marked deterioration in functioning. Furthermore, it is unlikely she could remember and carry out instructions repeatedly, being easily distracted by the scope and severity of her psychiatric symptomology. Her condition is chronic and expected to continue over the next twelve or more months. If awarded funds, [Plaintiff] is capable of managing funds.

R. at 227. Tollison diagnosed affective disorder (cyclothymic disorder), personality disorder (mixed borderline, histrionic, paranoid, schizoid features) and a GAF of 45. R. at 227.

**B.      Hearing Testimony**

At the hearing, Plaintiff testified that she has an Associate of Science degree in medical laboratory technology and that she has used her degree in past work. R. at 253. Plaintiff testified that in the past she worked testing refrigerators, as a lab technician for Dalton Corporation, as a press operator, as a medical lab technician, and as a security guard. R. at 254, 257, 261-62. Plaintiff

further testified that she had only tried marijuana two times when she was seventeen years old. R. at 264. When questioned by the ALJ about her statement to Ruffing that her mairjuana use was recent, Plaintiff stated that she did not believe she told Ruffing it was recent. R. at 278. Plaintiff stated that the symptoms of her polycythemia were tiredness, fatigue, diarrhea, and nervousness. R. at 268. Plaintiff also indicated that she has "a little bit" of a breathing problem in that she cannot run "very far" with her dog. R. at 269-70. Plaintiff testified that she smokes half of a pack of cigarettes per day. R. at 270. Plaintiff indicated that she is depressed much of the time, and that she quit her hobby of stripping furniture due to a lack of motivation. R. at 273, 276. Plaintiff stated that she thought seeing a psychologist would be good, but she did not want to take drugs. R. at 278. Plaintiff further stated that the reason she had not previously seen a psychologist was because of money. R. at 278. Plaintiff testified that she does not like to be around people at all and that she married her current husband after knowing him for four years. R. at 280-81.

After Plaintiff's testimony, the vocational expert testified. The following exchange took place:

> ALJ: I want you to assume, for the first hypothetical, that the claimant has moderately severe to severe sensory neural [sic] hearing loss with speech discrimination 80 percent in the right ear, 45 percent in the left. And I want you to assume that she needs jobs that there's little to no conversation required. Are any of the jobs that she's had in the past appropriate?

> VE: Well, with those restrictions, Your Honor, it would appear that security guard, press operator, medical lab technician and the refrigeration tester would fall within those parameters.

> . . .

> ALJ: Okay. All right. And then I want you to assume that she needs to avoid, this is a cumulative question, avoid very dirty air, and dangerous environments so that if, you know, she could take care to protect herself if she couldn't hear it. If there was

vehicles coming along and, you know, things out of control so that people had to hear things and get out of the way, that wouldn't be appropriate for her okay. So very dirty air, dangerous environments and, okay. So add those. Any of these jobs still doable?

. . .

VE: Really all of them would be precluded with those other provisions.

ALJ: Okay. How about the security guard and the medical lab tech?

ALJ: Well, the security guard, when I say hazardous, more, I'm talking about someone sneaking up on her or something like that. But is, is it just machinery?

VE: Well, I'm assuming that she worked during the day. She worked while, she wasn't a night watchman.

ALJ: Okay.

VE: That's, that's what I gained from what she did. And she seemed to work on the computer a lot as a security guard, and I think checking people in and out. That's what I get from it. I'm not quite sure. Let me see if we get something from the - -

Plaintiff: May I say something? May I say something?

ALJ: Sure

Plaintiff: I didn't work on the computer a lot, just a little. And I believe it had something to do with their attendance records.

ALJ: Okay. She said she deposited payroll checks on Fridays, and took computer data discs to the regional computer center. And if she worked second shift she made rounds once an hour. So it doesn't - -

VE: It doesn't appear that that would really, that with those provisions in the hypothetical would impede that job, or the medical lab technician.

ALJ: Okay. So they would still be doable.

VE: Correct.

ALJ: And then for the last hypothetical, if the claimant does not, quote, this is the third hypothetical, "does not exhibit the ability to accept instructions and respond

appropriately to criticism from supervisors.

VE: In a market, just plain does not. Does not.

ALJ: Does not.

VE: With that, and I think if you look at it cumulatively, it's going to really prevent any of the last relevant jobs, or really any work in the national economy.

R. at 285-88. The ALJ noted at the hearing that Plaintiff was able to work in the past and did not apply for disability until a year after she lost her most recent job. R. at 289. The ALJ questioned when Plaintiff got to the point where she could not work. R. at 289. Plaintiff's attorney admitted that Plaintiff was laid off from her last job, that the case is better documented as to Plaintiff's psychological problems beginning in 2005, and that a finding of a later onset date might be appropriate. R. at 291-92.

## C.     ALJ's Decision

On January 23, 2008, the ALJ issued a decision finding that Plaintiff was not disabled within the meaning of the Act because she could perform past relevant work as a medical lab technician or a security guard.[1] R. at 14-30. The ALJ made the following findings:

(1) The claimant meets the insured status requirements of the Social Security Act through December 31, 2008.

(2) The claimant has not engaged in substantial gainful activity since November 30, 2003, the alleged onset date (20 C.F.R. §§ 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

(3) The claimant has the following severe impairments: polycythemia rubra vera, hearing loss, chronic obstructive pulmonary disease, cyclothymia and personality disorder. (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

---

[1]     The Commissioner effectively conceded on brief that Plaintiff could not perform her PRW as a security guard. Entry 8 at 16.

(4) The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

(5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: a limitation to little or no personal interaction or conversation with others required on the job; the need to avoid very dusty air; the need to avoid dangerous situations; and the need to avoid excessive noise.

(6) The claimant is capable of performing past relevant work as a medical lab tech or a security guard. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

(7) The claimant has not been under a disability, as defined in the Social Security Act, from November 30, 2003 through the date of this decision (20 C.F.R. §§ 404.1520(f) and 416.920(f)).

R. at 16-30. On February 19, 2008, Plaintiff requested review of the ALJ's decision. R. at 10. On January 15, 2009, the Appeals Council denied Plaintiff's request for review of the ALJ's decision. R. at 6. As a result, the ALJ's decision became the final decision of the Commissioner. R. at 6

## II. STANDARD OF REVIEW

The role of the federal judiciary in the administrative scheme established by the Social Security Act is a limited one. Section 205(g) of the Act provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g). "Substantial evidence has been defined innumerable times as more than a scintilla, but less than a preponderance." *Thomas v. Celebrezze,* 331 F.2d 541, 543 (4th Cir. 1964). This standard precludes a *de novo* review of the factual circumstances that substitutes the court's findings for those of the Commissioner. *Vitek v. Finch*, 438 F.2d 1157,

15

1157 (4th Cir. 1971). The court must uphold the Commissioner's decision as long as it is supported by substantial evidence. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972). "From this it does not follow, however, that the findings of the administrative agency are to be mechanically accepted. The statutorily granted right of review contemplates more than an uncritical rubber stamping of the administrative action." *Flack v. Cohen*, 413 F.2d 278, 279 (4th Cir. 1969). "[T]he courts must not abdicate their responsibility to give careful scrutiny to the whole record to assure that there is a sound foundation for the [Commissioner's] findings, and that his conclusion is rational." *Vitek*, 438 F.2d at 1157-58.

The Commissioner's findings of fact are not binding if they were based upon the application of an improper legal standard. *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). However, the Commissioner's denial of benefits shall be reversed only if no reasonable mind could accept the record as adequate to support that determination. *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

## III. THE APPLICABLE LAW AND REGULATIONS

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are "under a disability." 42 U.S.C. § 423(a). Disability is defined in 42 U.S.C. § 423(d)(1)(A) as: "[the] inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."

The Social Security Act has by regulation reduced the statutory definition of "disability" to a five-step sequential evaluation process. The five steps require a court to determine: (1) whether

the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant has an impairment that meets or equals one of the listings in the appropriate appendix; (4) whether the claimant is prevented by the impairment or combination of impairments suffered from engaging in his or her relevant past employment; and (5) whether the claimant has the ability to engage in other gainful activity considering his or her age, education, past relevant experience, and residual functional capacity. *See* 20 C.F.R. § 404.1520 (2007).

An individual may be determined not disabled at any step if found to be: gainfully employed, not severely impaired, not impaired under the Listing of Impairments, or capable of returning to former work. In such a case, no further inquiry is necessary. If, however, the claimant makes a showing at Step Four that return to past relevant work is not possible, the burden shifts to the Commissioner to come forward with evidence that the claimant can perform alternative work and that such work exists in the national economy. *Harper v. Bowen*, 854 F.2d 678 (4th Cir. 1988); *Coffman v. Bowen*, 829 F.2d 514 (4th Cir. 1987). The Commissioner may meet this burden by relying on the Medical-Vocational Guidelines (the "Grids") or by calling a vocational expert to testify. 20 C.F.R. § 404.1566. The Commissioner must prove both the claimant's capacity and the job's existence. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

## IV. <u>DISCUSSION</u>

**A.      The ALJ's Finding that Plaintiff Can Perform Past Relevant Work**

1.      <u>Whether Plaintiff's Past Work as a Medical Lab Technician is Past Relevant Work</u>

Plaintiff objects to the Magistrate Judge's finding that the ALJ appropriately characterized Plaintiff's medical laboratory technician employment as past relevant work ("PRW") because

Plaintiff's occupational training may be considered as a portion of her training as a medical laboratory technician for purposes of the specific vocational preparation ("SVP").[2] Plaintiff argues that because she only worked as a medical laboratory technician for three months, she had not yet learned to do the job such that it can qualify as PRW. In addition, Plaintiff contends that the Magistrate Judge's finding that Plaintiff's education could satisfy the duration requirement for past relevant work is an improper post-hoc rationalization not given by the ALJ.

PRW is work that a social security claimant has done within the past fifteen years, that was substantial gainful activity, and that lasted long enough for the claimant to learn to do it. 20 C.F.R. § 404.1560(b)(1). ALJ's are statutorily required to include in their decisions a discussion of "findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law, or discretion presented on the record." 5 U.S.C. § 557(c)(3)(A) (1988). The Fourth Circuit has stated that "[s]trict adherence to this statutorily-imposed obligation is critical to the appellate review process. *See v. Washington Metro. Area Transit Auth.*, 36 F.3d 375, 384 (4th Cir. 1994). In accordance with this requirement, courts have remanded cases "where the reasoning for the ALJ's conclusion is lacking and therefore presents inadequate information to accommodate a thorough review." *Id.*; *see also SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("If an order is valid only as a determination of policy or judgment which the agency alone is authorized to make and which it has not made, a judicial judgment cannot be made to do service for an administrative judgment. For purposes of affirming no less than reversing its orders, an appellate court cannot intrude upon the

---

[2] The Dictionary of Occupational Titles ("DOT") entry for medical lab technician indicates that the position of medical lab technician has an SVP of 5, requiring over six months and up to and including one year to learn the job. DOT of Medical-Laboratory Technician, DICTOR 078.381-014, 1991 WL 646827 (1991).

domain which Congress has exclusively entrusted to an administrative agency.").

While the Magistrate Judge is correct that vocational education can include vocational training,[3] the ALJ in this case never explained the basis for her finding that Plaintiff's former job as a medical laboratory technician was PRW. Without knowing the reasoning for the ALJ's decision, the court cannot properly assess whether the ALJ's PRW determination is based on substantial evidence. The court will not substitute its own judgment for that of the ALJ. Therefore, the case shall be remanded for further explanation of the reasons behind the ALJ's finding that Plaintiff has PRW as a medical laboratory technician. *Washington Metro.*, 36 F.3d at 38.

    2.    Whether the ALJ's Failure to Comply with SSR 82-62 was Harmless Error

Plaintiff next objects to the Magistrate Judge's determination that any failure to comply with SSR 82-62 by the ALJ was harmless error because the ALJ considered the demands of Plaintiff's PRW as required and Plaintiff did not meet her burden of establishing that she could not perform her PRW. Plaintiff contends that the Magistrate Judge failed to acknowledge or discuss that the ALJ

---

[3]    SVP "is defined as the amount of lapsed time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation." DOT App'x C. SVP includes training given in any of the following circumstances:

> a.    Vocational education (high school; commercial or shop training; technical school; art school; and that part of college training which is organized around a specific vocational objective);
>
> b.    Apprenticeship training (for apprenticeable jobs only);
>
> c.    In-plant training (organized classroom study provided by an employer);
>
> d.    On-the-job training (serving as learner or trainee on the job under the instruction of a qualified worker);
>
> e.    Essential experience in other jobs (serving in less responsible jobs which lead to the higher grade job or serving in other jobs which qualify).

DOT App'x C.

is required to obtain details regarding the demands of past work from the claimant. Plaintiff also contends that she established an inability to perform her PRW because the DOT entry for medical laboratory technician and the work as she actually performed it required personal interaction beyond her RFC.

A claimant bears the burden of demonstrating that her impairment prevents her from performing past relevant work. *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995). If a claimant can perform past relevant work either as she performed it or as it is generally performed in the economy, the claimant is not disabled within the meaning of the Act. SSR 82-61. SSR 82-62 requires ALJs to consider past work experience carefully to ensure that the facts support his or her conclusion regarding the claimant's ability or inability to perform past work. The regulation states:

> The claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work. Determination of the claimant's ability to do PRW requires a careful appraisal of (1) the individual's statements as to which past work requirements can no longer be met and the reason(s) for his or her inability to meet those requirements; (2) medical evidence establishing how the impairment limits ability to meet the physical and mental requirements of the work; and (3) in some cases, supplementary or corroborative information from other sources such as employers, the Dictionary of Occupational Titles, etc., on the requirements of the work as generally performed in the economy.
>
> The decision as to whether the claimant retains the functional capacity to perform past work which has current relevance has far-reaching implications and must be developed and explained fully in the disability decision. Since this is an important and, in some instances, a controlling issue, every effort must be made to secure evidence that resolves the issue as clearly and explicitly as circumstances permit.
>
> Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).
>
> Adequate documentation of past work includes factual information about those work

demands which have a bearing on the medically established limitations. Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source. Information concerning job titles, dates work was performed, rate of compensation, tools and machines used, knowledge required, the extent of supervision and independent judgment required, and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience. *In addition, for a claim involving a mental/emotional impairment, care must be taken to obtain a precise description of the particular job duties which are likely to produce tension and anxiety, e.g., speed, precision, complexity of tasks, independent judgments, working with other people, etc., in order to determine if the claimant's mental impairment is compatible with the performance of such work.*

(emphasis added).

The Dictionary of Occupational Titles ("DOT") entry for medical laboratory technician states that a medical laboratory technician:

Performs routine tests in medical laboratory to provide data for use in diagnosis and treatment of disease: Conducts quantitative and qualitative chemical analyses of body fluids, such as blood, urine, and spinal fluid, under supervision of MEDICAL TECHNOLOGIST (medical ser.) 078.261-038. Performs blood counts, using microscope. Conducts blood tests for transfusion purposes. May draw blood from patient's finger, ear lobe, or vein, observing principles of asepsis to obtain blood samples. May specialize in hematology, blood bank, cytology, histology, or chemistry.

DICTOR 078.381-014, 1991 WL 646827 (1991). The DOT indicates that medical laboratory technicians are generally required to participate in panel discussions, dramatizations, and debates; and speak extemporaneously on a variety of subjects. *Id.* However, the DOT states that interactions with others is not a significant part of the position. *Id.* The DOT also states that hearing is not present as a job requirement for medical laboratory technicians and that the noise level is a 3, which is a moderate noise level. *Id.*

The court finds that Plaintiff has not met her burden of establishing that she is unable to do her past work as a medical lab technician. The ALJ found that Plaintiff is limited to little or no personal interaction or conversation required on the job. Although Plaintiff indicates that she drew blood and answered the phone as a medical lab technician, the record contains information on how frequently Plaintiff performed these tasks. The mere performance of these tasks without evidence indicating that these tasks were significant job requirements does not demonstrate that Plaintiff is unable to perform the medical laboratory technician job as she performed it in the past. With regard to Plaintiff's argument that her RFC prevents her from performing the medical lab technician position as it is generally performed in the economy, the court notes that the DOT indicates that personal interaction is not significant. Plaintiff argues that the act of drawing blood from patients involves significant personal interaction. Plaintiff's contention boils down to an argument that the DOT job description is internally inconsistent because it indicates that personal interactions are not a significant part of the job, but requires workers to draw blood. The court notes, however, that drawing blood is a minor procedure that can involve very little personal interaction. The court agrees that the ALJ's failure to elicit detailed information regarding Plaintiff's job duties as a medical laboratory technician was harmless in light of Plaintiff's failure to establish that she cannot perform her past job as a medical laboratory technician. However, because the court is remanding the case for the reasons set forth in this opinion, the ALJ shall obtain the details of Plaintiff's past work as a medical laboratory technician to comply with SSR 82-62 and clarify her PRW analysis.

3.    Whether the ALJ's Failure to Comply with SSR 00-4p was Harmless Error

Plaintiff objects to the Magistrate Judge's determination that the ALJ's failure to comply with SSR 00-4p was harmless error. The Magistrate Judge found that this was harmless error because 1)

the VE's testimony indicated that Plaintiff could perform the medical laboratory technician job as described in the DOT and 2) Plaintiff did not identify any conflict between the VE's testimony and the DOT requirements for a medical laboratory technician position. Plaintiff contends that the VE never specified that his testimony was based upon the DOT description such that the ALJ could infer that there was no conflict between the VE's testimony and the DOT. Plaintiff also contends that there is a conflict between the DOT description and the job as performed because Plaintiff was required to answer the phone and draw blood in her old position, which, Plaintiff argues, is inconsistent with the DOT's indication that personal interactions are not significant in the medical laboratory technician position.

SSR 00-4p provides:

> Occupational evidence provided by a VE or VS generally should be consistent with the occupational information supplied by the DOT. When there is an apparent unresolved conflict between VE or VS evidence and the DOT, the adjudicator must elicit a reasonable explanation for the conflict before relying on the VE or VS evidence to support a determination or decision about whether the claimant is disabled. At the hearings level, as part of the adjudicator's duty to fully develop the record, the adjudicator will inquire, on the record, as to whether or not there is such consistency.

However, the failure to comply with SSR 00-4p does not necessarily require reversal. *See Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994) (finding the ALJ's error harmless when ALJ would have reached the same result notwithstanding an initial error in his analysis); *see Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (finding that an ALJ's failure to inquire about any conflict between VE's testimony and DOT was harmless error because there was no conflict).

The court agrees with Plaintiff that when the VE testified that Plaintiff could perform the medical laboratory technician position, he did not clearly indicate whether he was basing his opinion

on the job as Plaintiff performed it, the DOT, or both. Therefore, the VE's testimony does not imply that there is no conflict with the DOT. *See* R. at 287. The court, however, does not agree with Plaintiff that because she drew blood and answered the phone when she was a medical laboratory technician, there is a conflict between the VE's testimony and the DOT. Plaintiff's argument assumes that the VE's testimony was based upon the requirements of the job as Plaintiff performed it. It is not clear from the record that this is the case. *See* R. at 287. Moreover, even if the VE's testimony were based on the job as Plaintiff performed it, the court does not agree that the job activities of drawing blood and answering the phone are inconsistent with the DOT description. The DOT description of the medical laboratory technician position indicates that drawing blood is part of the job. *See* DICTOR 078.381-014, 1991 WL 646827 (1991). Therefore, this job requirement does not conflict with the DOT. Moreover, the answering of a telephone is not necessarily a significant personal interaction that would prevent Plaintiff from performing the medical laboratory technician position. Plaintiff has not established that in her position as a medical laboratory technician, answering the phone was frequent or involved significant conversation. Because Plaintiff has not shown a conflict between the VE's testimony and the DOT, the court agrees with the Magistrate Judge that the ALJ's failure t comply with SSR 00-4p was likely harmless error. However, because this case is being remanded for a new hearing and additional explanation on other grounds, the ALJ should put the SSR 00-4p consistency inquiry to the VE at the new hearing and resolve any conflict.

**B.      The ALJ's RFC Finding**

      1.      <u>Whether the Mental RFC Assessment of the ALJ is Based on Substantial Evidence</u>

      Plaintiff objects to the Magistrate Judge's finding that the ALJ gave valid reasons for

discounting Tollison's opinion that Plaintiff is unable to work. Plaintiff contends that the ALJ could not use the opinion of Ruffing to discount the opinion of Tollison because there is no inconsistency between the two opinions. Plaintiff also contends that the ALJ, in determining that Tollison's opinions were inconsistent with his objective testing, improperly substituted her own view of the objective testing to counter Tollison's opinions.

For the purposes of review, it is irrelevant whether the evidence permits a result inconsistent with that of ALJ so long as the ALJ's decision is supported by substantial evidence. *See Celebrezze*, 331 F.2d at 543 (citation omitted). This is because the agency is charged with resolving evidentiary conflicts. *Id.* The Social Security Administration is responsible for determining whether a claimant meets the Act's definition of disability. 20 C.F.R. § 404.1527(e)(1). In making this determination, an ALJ must review all of the medial findings and other evidence that supports a medical source's statement that a claimant is disabled. *Id.* While the Social Security Administration must consider opinions from medical sources regarding whether a claimant is disabled, the final determination rests with the Commissioner and no special weight is attached to medical opinions as to the ultimate issue of disability. 20 C.F.R. § 404.1527(e)(2), (3). *See also Morgan v. Barnhart*, 142 F. App'x 716, 721-22 (4th Cir. 2005) ("ALJ is under no obligation to give a treating physician's legal conclusions any heightened evidentiary value."). An ALJ cannot ignore the opinion of a treating physician, but must evaluate all of the evidence to decide the extent to which the treating physician's conclusion is supported by the record. *Morgan*, 142 F. App'x at 722.

Plaintiff's contention that there is no conflict between the opinions of Ruffing and Tollison is incorrect. Ruffing diagnosed Plaintiff with cyclothymic disorder and concluded that Plaintiff has some limitations in maintaining socially appropriate and predictable behavior, but that she can likely

"perform repetitive tasks and can understand, remember, and carry out detailed instructions." R. at 175. Tollison's opinion goes beyond that of Ruffing to find that Plaintiff exhibits symptoms consistent with personality disorder with borderline, histrionic, paranoid, and schizoid features. R. at 227. Moreover, Tollison concluded that it "is unlikely [Plaintiff] could remember and carry out instructions repeatedly, being easily distracted by the scope and severity of her psychiatric symptomology." R. at 227 (emphasis added). Tollison's conclusion that Plaintiff likely could not remember and carry out instructions directly conflicts with Ruffing's conclusion that Plaintiff can perform repetitive tasks, and remember and carry out detailed instructions. Therefore, the ALJ properly found a conflict between the two opinions.

Thus, the issue becomes whether the ALJ's rejection of Tollison's opinion that Plaintiff is unable to work is supported by substantial evidence. Although Tollison was of the opinion that Plaintiff was unable to work, the ALJ did not owe this opinion special deference. In her decision, the ALJ noted that Plaintiff's description of her daily activities to Ruffing was inconsistent with the description she gave to Tollison one year later. For example, Plaintiff indicated to Ruffing that furniture stripping was one of her hobbies (R. at 174), but told Tollison one year later that she had quit stripping furniture years before because she had lost interest (R. at 204). Moreover, the ALJ correctly points out that Tollison's conclusion that Plaintiff cannot remember and carry out instructions is inconsistent with Ruffing's conclusion. The ALJ further noted that the State Agency Medical consultants concluded that Plaintiff could do unskilled work in positions that do not require ongoing interaction of the public. This evidence is sufficient to support the ALJ's Mental RFC assessment that Plaintiff can perform work with little or no personal interaction or conversation with

others required on the job.  The ALJ's opinion is supported by substantial evidence.[4]

  2. <u>The Magistrate Judge's Hypotheticals</u>

  Plaintiff objects to the Magistrate Judge's determination that the hypotheticals put to the VE sufficiently reflect her RFC finding.  The Magistrate Judge found that although the ALJ's wording of the hypothetical question did not verbatim include the need to avoid excessive noise, Plaintiff's hearing limitation was adequately addressed by the hypotheticals.  The court disagrees with the Magistrate Judge.

  "The opinion of a vocational expert is not helpful if it is not delivered 'in response to proper hypothetical questions which fairly set out all of [a] claimant's impairments.'" *Fisher v. Barnhart*, 181 Fed. App'x 359, 364 (4th Cir. 2006) (citing *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir.1989) (emphasis added)).  Although the court agrees that the hypotheticals addressed the restriction that Plaintiff needed a job where hearing was not a requirement, they did not address Plaintiff's need to avoid excessive noise.  Plaintiff's need to avoid excessive noise is, to some extent, distinct from her need for a job where hearing is not a requirement.  Hopkins indicated that excessive noise contributes to Plaintiff's inability to discriminate between sounds, which could prevent Plaintiff from hearing fire alarms or other warnings, putting her in danger.  *See* R. at 167.  This limitation therefore addresses, not only Plaintiff's ability to perform a job, but Plaintiff's safety.  Because the ALJ did not properly incorporate this limitation into the hypotheticals put to the VE, the VE's testimony that Plaintiff can perform the medical laboratory technician job cannot be relied upon in a disability determination.  The case will be remanded so that the ALJ may hold another hearing to put a proper

---

[4] The court does not reach the issue of whether it was improper of the ALJ to discount Tollison's opinions based upon an inconsistency with objective testing because the ALJ's Mental RFC was supported by substantial evidence even without this determination.

hypothetical before the VE for the purpose of determining whether Plaintiff can perform past relevant work.

## C.      The ALJ's Credibility Finding

Plaintiff objects to the Magistrate Judge's conclusion that substantial evidence supports the ALJ's finding that Plaintiff lacks credibility.  Plaintiff makes several arguments as to why the ALJ's credibility determination was improper.  As was noted above, substantial evidence is more than a mere scintilla, but less than a preponderance.  *Celebrezze,* 331 F.2d at 543.  The fact that the record might support an inconsistent conclusion is immaterial so long as substantial evidence supports the ALJ's conclusion.  *Blalock*, 483 F.2d at 775.

Plaintiff argues that it was improper for the ALJ to rely upon her failure to quit smoking  in making an adverse credibility determination.  The court agrees that tobacco cigarettes are addictive and that Plaintiff's failure to cease smoking cigarettes may not substantially support an adverse credibility determination.  *Shramik v. Apfel*, 226 F.3d 809, 813 (7th Cir. 2000).  However, Plaintiff also appears to argue, based on the addictive nature of smoking, that it was improper for the ALJ to make an adverse credibility determination based upon Plaintiff's inconsistent representations regarding marijuana use.  This argument is without merit.  Plaintiff reported to both Ruffing and Tollison that she had used marijuana recently, but told the ALJ that she had not smoked marijuana since she was seventeen.  The ALJ even pointed out the inconsistency to Plaintiff who stated she did not tell Ruffing that the marijuana use was recent.  R. at 278.  The ALJ's reliance on this inconsistency in making an adverse credibility determination was entirely proper and in no way punishes Plaintiff for an addiction.  Plaintiff's inconsistent statements regarding marijuana use alone are sufficient to sustain the ALJ's credibility determination as this evidences a lack of credibility on

the part of the Plaintiff and amounts to more than a mere scintilla of evidence that Plaintiff was not credible. Because the court finds that substantial evidence supports the ALJ's credibility determination, the court declines to address Plaintiff's additional arguments.[5]

**D.      Remainder of Report and Recommendation**

Plaintiff did not object to the remainder of the Report and Recommendation. Nevertheless, the court has conducted a *de novo* review of the remaining issues and finds no clear error on the face of the record.

## V.  CONCLUSION

Based upon the foregoing, the Commissioner's decision is reversed and remanded under 42 U.S.C. § 405(g) for an explanation of the ALJ's reasons for finding that Plaintiff's past work as a medical laboratory technician is PRW, and so that the ALJ may 1) obtain details regarding Plaintiff's past work as a medical laboratory technician to clarify the PRW analysis; 2) make the SSR 00-4p consistency inquiry and resolve any conflict between the VE's testimony and the DOT; and 3) revise the hypothetical put to the VE to include the excessive noise restriction.

**IT IS SO ORDERED.**

s/ Margaret B. Seymour
Margaret B. Seymour
United States District Judge

September 17, 2010
Columbia, South Carolina

---

[5] The court notes that Plaintiff criticized the Magistrate Judge for not addressing each of her arguments. The Magistrate Judge was only required to determine whether the ALJ's credibility determination was supported by substantial evidence. Once the Magistrate Judge made such a finding, no further consideration was necessary.